Thank you, Your Honor. I'm James Wagstaff. May it please the Court, I am here on behalf of the plaintiff and the appellant in response to a ruling on summary judgment. I would ask that I reserve two minutes for rebuttal if we reserve that time. Your Honor, we are here on summary judgment and therefore all inferences in the record should have been and must be indulged in favor of the evidence in this record. My client was violently gang raped as a student at UOP by three-star basketball players. And the evidence below showed that the university failed to adequately respond to this and an earlier act of gender violence. And thus it acted in a clearly and reasonable manner, entitling my client to go forward with her Title IX claim. If I could ask at the threshold, I know the filings here have been under seal. Yes, Your Honor. What is it we're supposed to avoid or what is it that is non-public about this? Your Honor, the names of the other sides, the names of the persons who have, who were charged and found liable by the university commission, my client's name is there. So it's the names we should avoid? I'll try to be my best. We're three and a half years after the incident. And we are legitimately asking a question, Your Honor, about the potential stigma value of this incident. And that's a very good question. And it brings us right to the meat of the matter, which is a reasonable trier of fact. If you indulge all inferences the law requires, and I suggest respectfully the trial court and the briefs by the appellees do not do so, that is that a reasonable trier of fact could find that the university, with its minimal investigation of the initial act in April, that is the first rate, failed to adequately protect women from gender violence and my client in particular. The standard is deliberate indifference, which, of course, has been interpreted by the Supreme Court to mean clearly unreasonable. What was the evidence in all inferences? If I had a jury sitting on that bench over there, what could I ask the jury to infer? Let's go back to the first incident. And my recollection on the facts there, this is the April 7 incident, is that correct? That is the evening of April 6, Your Honor. Or 6, okay. That's the first incident. Yes, Your Honor. Ultimately, you have no complaining witness, correct, because that individual doesn't want to go forward. Is that correct? For a criminal prosecution, that's correct, Your Honor, where they must prove it beyond a reasonable doubt. The case law is clear that Title IX is not somehow avoided or satisfied simply because the police choose not to investigate. The McGrath case tells us that, particularly on a higher standard. Because you can imagine a case in which the police, for whatever wrong reasons, decide not to do something. It does not absolve the university of its obligations. Was she a student? She was, Your Honor. She was a basketball player. No, no. No, she wasn't, Your Honor. The first person is not a student. Okay. So what powers did the university have to compel a non-student to cooperate with them when she was declining to cooperate with the police? They don't have that power, Your Honor. So the question is, what did they do notwithstanding that initial lack of cooperation? Okay. Because they didn't call her either. So what else should the university have done? That's a good question, Your Honor, with my jury reasonable inferences. We have the director of the DPS, the public safety on campus, who tells us, with all interest in our favor, that he had an actual suspicion of one of the assailants who later raped my client. If we've got college police chiefs or anybody else from law enforcement acting on suspicions, we've got a boatload of lawsuits coming in the other door. We do, Your Honor. What do you have more than his gut feeling? Oh, no. He testified more than his gut feeling. It was such a gut feeling he told two other people about it, including the police. So it wasn't sort of, I think, maybe. There's more than that, Your Honor. You know those 1995 Ginshu knife ads where they say there's more? There's a lot more here. The individual lived in the very building. How many rooms in the building? That I do not know, Your Honor. He was in A13, which he specifically told the police and he told the vice president of the university that I believe that there's a connection to A13, which is the very room, A13. He specifically said that, Your Honor, 246 and 250 of the record. You can read that. The inference is that this director didn't just have a gut feeling. He thought it was out of A13. And what was that gut feeling based on? The assailant, who was identified by the victim in rape number one, had specifically generally matched the description. This individual who raped my client generally matched the description. Well, six inches off in height. Well, Your Honor, that's very interesting. They were two inches off in their brief. She said he was very tall. And, Your Honor, I think we're going to understand that when a victim of a rape is reacting to someone and says he's very tall, I don't think that a police officer can not notice the difference between 6'3 and 6'8. I'm not sure. I mean, again, I'm trying to avoid names. The person accused by your client wasn't, in fact, the rapist in the first episode. He was described by the assailant as having been present in the room. That was later, Your Honor, but as naked and present in the room, she also said, and I'm happy to give Your Honor the citation, that a naked man came to her bed after she saw him in the doorway. So we don't entirely rule out the possibility. But that's not the issue. The issue is what would a reasonable investigation, clearly an unreasonable investigation in this case, that would have followed up on the suspicion. You can read the records to what he said. He didn't think it was so minor that he didn't tell the police. He didn't think it was so minor about 8'13 and this individual that he didn't tell the university. He specifically told them, and he said, this is my actual suspicion. So what did they do in response to that suspicion? What they did, Your Honor, was nothing. They did not interview that individual. They didn't do nothing because he just told me he told other people about his suspicion. What is it that you allege should have been done that wasn't? Thank you, Your Honor. The university did nothing. Given that information, they did not interview the individual. Who's they? They mean the university. Yeah, but who is the university? Who's responsible? Well, in this case, Mr. Belcher would be an example. He's the director. All right. But he's the one who had the suspicions, right? And Ms. Griego, who was told the information. Okay. So Ms. Griego then should have called the non-student who's not cooperating with the police? I'm still trying to figure out who they is and who's supposed to do what. The Department of Public Safety, which is the university, had this actual suspicion. Right. This is Belcher, who's the director. Belcher made an actual choice, a choice, not to interview him, not to even go to the building. They thought it might have been the registered parties. This was an unregistered party where the rape took place, the first rape. This individual, the person who raped my client, had an unregistered party two weeks later in his room. In his room. He matches the description. They don't interview him? They don't interview him. They don't interview anybody else in the building. They do not follow up and say, did you see someone who looked this way on the night in question? That's the mid-April party? It is, Your Honor. Does the university own the building? Yes, Your Honor. It's a townie. I believe so. It's called the townies. It's like Isla Vista. But you didn't have non-students living in the building? I don't believe so, Your Honor. But I thought you told me that the victim was not a... The victim was taken to that place, Your Honor. She didn't live in the building? That's the record, Your Honor. Okay. All right. So the fact of the matter is, is that they don't do anything. They don't interview anybody in the building. Had they done so to protect the possibility, because we know we have a rapist at large on campus, potentially, coming out of that A building with a suspicion directed to A13, this individual's place. Had they interviewed him, the law allows an inference that he might have said, wait a minute, they're paying attention to this. They might have actually pursued further remedies against him. They might have done something about the party that he did, in fact, hold in the middle of A. That's a lot of mights to add up that the university is being deliberately indifferent. It is, Your Honor, with this exception. Your Honor's well aware, because I read all your opinions about the outlaw rule, which is that if they're fair to investigate, it does not lead to certain information. You can't say it's speculative, because they didn't do it at all. We don't know for sure what would have happened, but the jury's allowed to reasonably infer what might have happened in that situation. Well, if they go interview the alleged assailant, as it turns out later, even the victim the first time doesn't identify him as the assailant. I think it's unlikely he's going to confess, I did it. I'm not sure what that leads to. Your Honor, I raised four kids to go through college. When the police come and they're looking at a particular kind of incident and they're giving some indication of focused suspicion, you have kids, you know that that certainly a jury could infer from that seat over there, could infer that when reasonable suspicion is aimed at you, you're not going to go rape someone weeks later. That you know that that's a reasonable inference. I'm here on summary judgment, not accurate trial. I don't think that actually history and facts would support that inference, Mr. Wagstaffer. Your Honor, let me say this, though. Let me go back to Belcher does tell the police, correct? Belcher tells the police. Okay. And so that's not deliberately indifference. That's actually a positive step. It is, Your Honor. Would you agree with that? I would. So in your view, what's lacking here is Mr. Belcher actually undertaking an investigation on behalf of the university. That's what Title IX requires, Your Honor. He's not permitted under Title IX to rely on the police's actions or inactions. He's not permitted to do so. The reasons he gives for not doing so are legitimately a subject of jury questionnaire. He said racial profiling. We can talk about whether this would in any way have been racial profiling given he had other facts. He gives reasons for not doing it. None of it has to do with I didn't think he was a suspect. He gives alternative reasons that a jury could disbelieve. And, Your Honor, don't believe me. Believe the record. Because, in fact, the judicial affairs director herself and Ms. Griego, that's Ms. Carlton and Ms. Griego, specifically told my client and her parents that they believed there was a, quote, very close relationship between Rape No. 1 and Rape No. 2. That's a 147 on the record. That gets us there. Your Honor, even if we find that somehow the first incident was not enough, the fact is that there's a reasonable trier of fact could find that the university did not adequately respond to the actual sexual assault here in May. The university, there is evidence in the record which must be accepted. Counsel, I want to make sure I've got the standard here. I thought the standard was deliberate indifference. It is, Your Honor, which under Davis means clearly you can satisfy by showing it was clearly unreasonable response. Unless it's your own harassment, which you're liable for. Okay. That's a little different than the language that you used, which was that this was an inadequate response. Well, no, that's the language Davis and Oden take us through. Inadequate response means it has to be deliberately indifferent, which is defined as they clearly did not act reasonably. That's the standard. That's the standard. Your Honor, in this case, we have evidence of direct harassment. I won't belabor the point. The record from 197 to 98 tells us that Ms. Griego told my client, after the hearing but before the ruling, told my client that these were very popular players and they wouldn't need to rape someone to get sex, and told my client that the rapists were victims, too. That alone is enough for me to look a jury in the eye and say that there was actual harassment, not even fair to prevent. Your Honor, Davis and Oden. No, to be told that there may be another side of the story doesn't strike me as harassment. That's an inference, Your Honor. I don't see how it becomes harassment. How does it become harassment for your client to be told that they have a different story and there is some logic that supports their story? Quite different than that, Your Honor. They were very popular and did not need to force anyone to have sex with them. That's not they have a different story. That's you're not telling the truth. That's a very different story. Well, that's what happens during cross-examination. That's the adversary system. Exactly. And if I were standing here after a trial, I'd look you in the eye and say that's a really hard argument. I'm here on summary judgment in which the inferences we're debating... No. We're not talking about summary judgment. We're talking about is that harassment? I don't understand how that can be harassment. Challenging, making sure that your client's story holds together, how does that become harassment? That's the adversary system. They were so popular and did not need to force anyone to have sex with them. The university conducted a judicial hearing or one of these disciplinary hearings that they have, and the outcome of that hearing is that these three athletes were determined to... To be sexual assaulters. ...have sexually assaulted your client. Without consent. Correct. Which is a rape. Right. And, Your Honor... So the university had a process. It went through its process. It fulfilled the process, and the result was, you know, the obvious... The result was... ...the later discipline, which I know you disagree with the disparate discipline between the two categories of people, but what does it... I guess my question is, when you have that, how does this one statement hanging out over here figure in? Because it's combined with what else I'm about to talk about, Your Honor, the whole record. The fact is, is that when this finding is found of sexual assault, the university does not act reasonably to ensure that we know contact with the assailants. Let me be very straightforward, and I've got the two Kennegate cases I think are very worthwhile to read. The case out of Yale and the other case. Someone is raped. Violently raped. A jury could conclude that it is the obligation of the university to ensure their separation on an ongoing basis during the tenure or per time of the school. This is not just a 4,000-person school. This is a 25-person basketball program. 13... 26. This is a 300-person athletic department. These two teams are using the same weight room. The same gym. They're traveling together. We know there was a lot of socializing before. And this university makes a decision, deliberately, to not separate them after the fact. Oh, you're told not to talk to her. But they acknowledge in the record that there was no practical way to separate these once you get back. A reasonable jury could conclude that if you're raped... My wife, just a block from here, was a victim of something, and she can't walk there to this day 31 years later. My client was being asked to go back to school where within a matter of months one of her rapists was going to be in her gym practicing basketball at the same time. And this university, under Title IX, as an inference can show, has an obligation to create that separation. That is, Your Honor, look at 389 and 390, the record. You've expired your time already. I have, Your Honor. You have. Thank you. So I'm going to hear it now from the university. And if I could just have a brief rebuttal, Your Honor, I'd appreciate that. Good morning, Your Honors. I'm Joseph Maskovich. I represent the University of Pacific. The district court granted summary judgment for University of Pacific in this case only after it took a close and comprehensive look at all the evidence and the law applying Title IX. The plaintiff asserted three claims for relief. First, that the university failed to prevent her assault. Second, that the university's response to her assault was indicative of deliberate indifference. And third, that the university retaliated against her for challenging the Judicial Review Board's decision. I'd like to start with the second claim. And with respect to that second claim, there are simply no disputed material facts suggesting that the University of Pacific violated Title IX. In sharp contrast to the decisions that have denied summary judgment or have reversed summary judgments, in this case, the university never sought to minimize or downplay the incident, such as telling plaintiff to work it out on her own, by relying upon something like some sort of informal mediation process, or simply talking to the individuals involved. On the contrary, as soon as the university learned of the assault, it acted on several fronts. It encouraged the plaintiff to file a police report. It investigated the circumstances of the assault. And third, it promptly initiated its Judicial Review Board process and charged the three respondents with very serious violations of the student code. And the disciplinary process resulted in the expulsion of one student, suspensions of the other two, and that decision was affirmed by the university's appeals committee and upheld by the university administration. Kagan. Let me stop you. I think the, you know, we always, after these arguments, go back and reread the evidence, take a look at the cases. But your explanation of what happened once Mr. Wagstaff's client, I guess Doe, was raped, seemed to proceed in an administratively fluid way, as one would hope it would in a university. But I want to kind of step back to the argument he makes, and that is that leading up to that point, that the university basically abdicated in terms of any kind of investigation. At the summary judgment stage, if the university is required to do something in response to Title IX, how is the university's decision not to do something as a matter of law reasonable? Well, I think part of my answer, it goes back to what the legal standard is under Title IX, and that's that under the teaching of the U.S. Supreme Court decisions in Gebser and Davis, the university needs to have actual knowledge or something very close to actual knowledge that harassment is occurring, and it needs to act with deliberate indifference. And in this context, that means that the university makes a conscious choice among alternatives, and it chooses a path, it chooses an action that it either knows or plainly should know. It is going to result in harassment or make the plaintiff more vulnerable to harassment. So with respect to the plaintiff's first claim about the failure to prevent this assault, at the time the assault occurred, number one, the university, in its arrangement with the Stockton police, the Stockton police have primary responsibility for conducting the investigation. That's very clear on the record. Second, the university did assist the Stockton police in conducting an investigation. Here's the difficulty I'm having. Maybe you can help me. If you spin it all the way out to the final conclusion, I'm not sure, you know, necessarily, a jury would find that the failure to take some action necessarily resulted or would have necessarily prevented. I mean, so I guess I'm not quite sure the endgame here that they have to prove. But if the university, because this is university apartments and there's these unregistered parties and there's at least one individual that they have strong suspicions is responsible, at least for these early potential rape and assault one and two, doesn't the university have some obligation to do something more than just say, well, we turn it over to the police and there we'll leave it? I mean, the whole point is that the university is operating in a milieu where it has unregistered parties. It's, you know, potentially a facility that's out of control from time to time. Don't they have some obligation to do something? And then the next question I have, though, is does that something have to be something that would prevent? I mean, is that link required in Title IX? Does that make sense, the question? Because that's where I'm having sort of an analytical issue. And that is, yes, there has to be a causal connection between the university's deliberate indifference and the damage that arose. So that causal connection is clearly present in the case law. Going to the first half of your question, I think the record shows that the university did not just sit back on its hands and rely upon the Stockton police. The problem is that the victim in that first assault, beyond giving a very general description of her two assailants, then stopped cooperating. Correct. And at that point, it was not known whether the assailants were university students, number one. Well, it was known it was in a university dormitory. It was in a university housing, but there was no indication or, you know, certainly no proof at all that the assailants were university students. But isn't that something the university then reasonably would have followed up on, particularly? They did follow up on that. The university, after all. And they then had a suspicion that it was Mr. X. No. No, that's not what the record shows, Your Honor. Okay. The university did not just sit back, rely upon the Stockton police. There was an investigation where the students and other persons who attended the party that seemed to be the scene of this assault were all interviewed. There was one other African-American male at that party who everybody agreed was present. They talked to him. They looked at his photographs. And he did not match the description given by the victim. And, again, the victim gave a very general – This is a university investigation you're talking about. The university was – participated in that investigation. So at the time when the victim declined any further cooperation, either with the university or with the Stockton police, they had a very general description without proof that a student was involved. And going back to your point about how one of the assailants in the plaintiff's case was, in fact, the assailant there, that's not what the record shows. At the time, the very first time that the university received information that one of its student athletes was accused of sexual assault was when the report came in for the assault on plaintiff. Up until that point, the university had never received a report that one of its student athletes had been involved in a rape, a sexual assault, or sexual misconduct of any kind. And going back to the point – He dropped the word athlete. I mean, I understand the back story of this is concern that the university was proceeding carefully because it was a star basketball player. But it knows that a sexual assault takes place in university housing. It knows that a couple weeks later other people in the same building are conducting an unregistered party. And there's enough so that the university police chief has suspicions that he communicates to others. Isn't that enough to put the university on some degree of notice and give it an obligation to do more than it did? I guess my response is that, yes, there probably would be an obligation to do perhaps a little bit more. I mean, under a negligence standard, did the university act reasonably in response to that information? But negligence doesn't satisfy Title IX. It has to be deliberate indifference. Deliberate indifference that we think of under the Eighth Amendment Constitution is a little different than deliberate indifference here. You know, I had to kind of like stop. And I was surprised that in a way the standard wasn't all that high. But they have to be unreasonable. Is that basically the standard? Well, it has to be more than that. They call it deliberate indifference. It is not unreasonable. Right. It's a deliberate choice among different courses of action. That are unreasonable. And that the university chooses a course of action that either knowingly puts the plaintiff in danger or plainly would have the result of putting her in danger. That's not the situation in this case. Well, the question, though, I think raised by her counsel is because it does involve an element of reasonableness. And because we have the university doing some things but not others, is that enough at least to get you to the jury? In other words, how is it that the district court can make this determination as a matter of law? It can make the determination as a matter of law because there is a distinct difference between reasonable conduct that goes into a negligence analysis and the type of conduct which rises to the level of deliberate indifference as defined by the U.S. Supreme Court in cases under Title IX. No. Now, I'm not saying that every case under Title IX is going to be appropriate for summary judgment. But certainly courts all the time, and including this court in actions under Section 1983, make the determination as a matter of law that while something may smack perhaps of some negligence, it doesn't meet the much higher standard of deliberate indifference. And that's like the Oden case. Oden is an example. There are many more. But even going back to the key Supreme Court decisions in this area, Gebster and Davis, that point is made crystal clear. Deliberate indifference is the test, and it has to be a conscious choice among alternatives that puts the student in danger. That's not what was done here. You had an unregistered ‑‑ going back to this idea of failure to prevent the assault, the person they focus on, one of the Respondents, didn't match the description given by the victim of the first assault. He was much taller than the information she gave. And that ‑‑ and the information she gave is recorded in the police reports that are part of the record in this case. He was several inches taller. He would fill a standard doorway. He was unusually tall and didn't match what the ‑‑ what the victim had said about her assailants. And she never identified him as an assailant anyway. We've kind of jumped between the first incident and the third incident. What about that middle one? Where does that fit in in your view? That's the one I started on. And going back to that, I think, you know, Your Honor, you outlined how the university's judicial review process was fluid. It moved as designed and resulted in the imposition of significant sanctions. Now, the plaintiff's argument, as articulated in their brief and articulated here again today, is that the university somehow violated Title IX by not expelling all three of the Respondents because they claim that the case law mandates that she be basically protected from having any interactions with the two Respondents who were suspended once they returned to campus. Well, number one, the cases they cite don't hold that. They don't hold that at all. And, in fact, such a holding would be contrary to the Supreme Court decision in Davis. The plaintiff is not entitled to a particular remedy. And this case involves very, very different facts from the three district court decisions that the plaintiff cites. Here, you did have the judicial review process going to its conclusion. That review board and the appeals committee relied upon a wealth of conflicting evidence on the question of whether or not any of the sexual contact that occurred was consensual. The plaintiff would have the court disregard that evidence and those findings, throw it aside, and basically say the university should still have expelled these people. They also overlooked the fact that the two Respondents who were suspended were subject to strict probationary terms. They could not have any contact with plaintiff. They could not communicate with her directly or indirectly. And once they returned to campus, they would have to maintain a minimum physical distance with the plaintiff. And if they violated these probationary terms, they would be expelled. And the university, as acknowledged by the plaintiff in her deposition, said, we will do anything within reason to accommodate your return to school. This was obviously an unprecedented event for the university. It wasn't like they had a checklist of things that they could do and couldn't do. But they promised her, and she acknowledged the promise, that as matters developed, as she returned to school, they would take whatever steps the university could take to make sure that she felt comfortable upon returning to school. And that's what she admitted. She admitted, certainly with respect to a retaliation claim, that the actions the university took had the intent of making her return to school comfortable and to prevent further harm from occurring to her. That's what the university did. This case is very different, as I stated at the outset, from those cases in which the university has tried to sweep under the rug claims of sexual assault, protected its athletes, or things of that nature. It's obviously been in the media in past months. But this case is different from those situations. It's different, and the district court realized that difference when it granted summary judgment. Now, the university remains deeply troubled and concerned by what happened in this case. And this case certainly brings to the fore a whole host of public policy questions about society's attitudes towards sexual assault and vape rate situations. And that's true for society generally. It's true for institutions of higher education. But the plaintiff really wants to transform those broader policy questions into proof that somehow the university violated Title IX. But those policy questions are not material to the elements that she must prove to prove a case under Title IX. And that's exactly why the district court, after taking a close look at the evidence in this case, granted the university's motion. We would like that the court to affirm that judgment. And unless the court has any questions for me at this time, I'm prepared to submit. Thank you. You may have a minute, Mr. Wagstaff. Let me do it this way. The record tells us they drew the connection between the two. Page 264, 147, specifically tells us the university drew the connection between Rate No. 1 and Rate No. 2. There's no different. The second incident, Your Honor, indicates how much they abdicated. The second incident is where they tied it specifically to Room A13, and the university did nothing. It didn't even go to the building to interview someone. Contrast that with what the police did when they thought it was in that first room. They actually asked the one black person to take a DNA test. They did nothing. They didn't interview them. They didn't go there. Your Honor, there is not a case out there which, when talking about a reasonable reaction to protecting women from gender violence on campus, in which there is a rape, in which the court has said there isn't a tribal issue of fact, that you have to separate them at all times. Separation here. No one's saying it had to be expulsion. No one's saying it had to be a specific remedy. Separation here, as the university admitted, was virtually impossible given the smallness of the program. There were alternatives. Delay their return. Not have them come back to the basketball program. Did he ever follow up on their offer that they would do anything reasonably to obtain it? No, Your Honor, because they wrote a letter. It's in the record at 184 to 186 in which they said, We're done. We're doing nothing further. 184 to 186. They wrote a letter to my colleague here and said, We're done. This is what we're going to do. They didn't offer to do anything that would allow reasonable separation. Did the university offer to allow her to come back at a future time and resume her scholarship? No, Your Honor. It wasn't raised. It wasn't considered. She's playing basketball, Your Honor. She's going to be in the same gym. She's going to be in the same weight room. The university concedes we can't separate. Could a jury conclude, as did the court in Connecticut, when it said, and I quote, when it denied summary judgment, a reasonable jury could conclude that further encounters of any sort between a rape victim and her attacker would create an environment sufficiently hostile. That was the holding in Kelly. But it makes sense. My client was gang raped in a violent fashion, and the university was saying, Within a semester, your rapist will be in the same gym with you in the same weight room on same trips. Expulsion, that's for the university to decide. But protect my client as Title IX obligates, which is you don't bring him back. And the notion, finally, Your Honor, the notion that they did nothing and they didn't downplay it, the scarlet letter of saying, Don't you dare talk to her. You say, well, is that the evidence? That's what the inferences support on page 204 to 206 of the record. They said, Don't talk to her. Because that clearly could support a jury's conclusion that they did, in fact, downplay it, that, in fact, they didn't give it the same weight that it should have been given. In this case, Your Honor, that's why we're not here after a trial. We're here after summary judgment where the inferences are in favor of my client. Thank you. Thank you, Your Honor. Thank both counsel for your argument this morning. The case of Doe v. University of the Pacific is submitted.
judges: McKeown, Clifton, Bybee